677 So.2d 166 (1996)
STATE of Louisiana in the Interest of K.N.F.
No. 96-390.
Court of Appeal of Louisiana, Third Circuit.
July 17, 1996.
*167 Leah Antoinette Beard, Lafayette, for State of Louisiana.
Jan Frederick Rowe, Abbeville, for Kathleen Felix (Mother).
Jed Gerard Gremillion, Lafayette, for K.N.F.
Joseph Ricky LaFleur, Abbeville, for "Mel" (Father).
Before SAUNDERS, SULLIVAN, and GREMILLION, JJ.
GREMILLION, Judge.
Kathleen F., the mother of K.N.F., appeals the judgment of the trial court finding her unfit as a parent and terminating her parental rights. For the following reasons, we affirm.

FACTS
K.N.F. was born on July 16, 1991. According to Kathleen, the father was a man named "Mel" with whom she had a brief affair while she was working at a motel in Lafayette, Louisiana. The whereabouts of "Mel" are unknown and his parental rights were terminated in the same proceeding giving rise to this appeal.
On September 20, 1991, Kathleen and K.N.F. entered a homeless shelter in Abbeville, Louisiana, and later that night, at 11:00 p.m., Kathleen demanded that she be allowed to leave the shelter and walk to DeRidder. She was eventually arrested by the police, leaving no one to care for K.N.F. On September 25, 1991, an instanter order was granted, placing K.N.F. in the temporary custody of the State of Louisiana, through the Department of Health and Human Resources. On December 4, 1991, K.N.F. was adjudicated a child in need of care based on the grounds of neglect and has been in the custody of the state since September of 1991.
On August 29, 1995, a hearing was held to determine whether or not Kathleen's parental rights should be terminated. After hearing the evidence, the trial court found that the state had proved by clear and convincing evidence that grounds exist under La.Ch. Code art. 1015(4) to terminate her parental rights. The judgment terminating Kathleen's parental rights was signed on September 17, 1995.

ASSIGNMENTS OF ERROR
Kathleen asserts the following assignments of error:

*168 1. The trial court erred in finding that the State had proven by clear and convincing evidence that Kathleen was unfit to retain parental control.
2. The trial court erred in finding that the State had proven by clear and convincing evidence that Kathleen had shown no significant, substantial indication of reformation and that there is no reasonable expectation of this reformation in the foreseeable future.
The factual findings of a trial court will not be set aside in a parental rights termination case absent manifest error. State in Interest of S.C. v. D.N.C., 26,104 (La.App. 2 Cir 6/22/94), 639 So.2d 426, writ denied, 94-1977 (La. 11/4/94); 644 So.2d 1061. The termination of parental rights is a severe and terminal action and to permit it the state must satisfy an onerous burden of proof. State In the Interest of JML, 540 So.2d 1244 (La.App. 3 Cir.1989). The state must prove by clear and convincing evidence all elements of its case. State in Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309 (La.1993).
La.Ch.Code art. 1015(4) provides the conditions that must be met in order for the state to terminate parental rights. It reads:
The grounds set forth in the petition must meet all of the conditions of any one of the following Paragraphs:
* * * * * *
(4) Prior adjudications as a child in need of care
(a) One year has elapsed since a child in need of care adjudication.
(b) The parent is unfit to retain parental control.
(c) The parent has shown no significant, substantial indication of reformation, and there is no reasonable expectation of his reformation in the foreseeable future.

CHILD IN NEED OF CARE
K.N.F. was adjudicated a child in need of care on December 12, 1991, and since that time she has been in the custody of the state. The first requirement of La.Ch.Code art. 1015(4)(a) has been met.

FITNESS AS A PARENT
"Unfit" is defined in La.Ch.Code art. 1003(10)(c) as a behavior or condition of a parent "[w]hose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonable near future based upon expert opinion or based upon an established pattern of behavior."
Testimony concerning Kathleen's fitness as a parent was provided by Jacqueline Vincent, a foster care case manager, who has been Kathleen's case worker since September of 1991. She testified concerning the history between Kathleen and K.N.F. from the time K.N.F. was two months old until the time of the termination hearing. In October of 1991, Kathleen was admitted to Acadia Mental Health Hospital after attempting suicide following the 72 hour hearing in which K.N.F. was continued in the care of the state. She remained there until November 4, 1991, when Vincent was able to locate shelter for Kathleen in Lake Charles. She was removed from the shelter on November 11, 1991, because she threatened to commit suicide, and was admitted to Moss Regional Hospital, where she stayed until December 2, 1991. An adjudication hearing was held on December 4, 1991, and the court continued K.N.F. in custody. This upset Kathleen and she threatened suicide once again. She was admitted that day to Acadia Mental Health where she remained until December 16, 1991, at which time she moved in with her grandmother and remained under the care of Acadia on an outpatient basis. However, she did not keep her appointments and was readmitted to Acadia and then transferred to Moss Regional where she stayed until January 21, 1992. After a subsequent judicial hearing she was committed to Moss Regional on a long term basis until March 26, 1992, when she was sent to East Louisiana State Hospital for long term treatment until November 11, 1992. Vincent remained in contact with Kathleen during this period, making visits twice a month with K.N.F. Vincent testified *169 that Kathleen's behavior was deteriorating during this period and she was placed in solitary confinement several times.
Since her release, Kathleen has attended parenting classes but has not consistently taken her medication. During the scheduled visits with K.N.F., Kathleen had to be prompted on how to feed and care for K.N.F., signifying that she did not appear to benefit from the parenting classes. Kathleen claimed that the classes did not focus on whipping or disciplining the children enough. Vincent noted that on these visits there was not much interaction between Kathleen and K.N.F.
On April 3, 1993, Kathleen moved into an apartment with her mother and supported her household with SSI, food stamps, and a medical card. She did not appear to be taking care of herself and would sleep until 2:00 P.M. or 3:00 P.M. However, in February of 1994, several months before the termination hearing, she appeared to improve, becoming more outgoing, and exhibiting a more positive attitude. The initial termination hearing, held on April 16, 1994, was suspended to allow a trial period in which K.N.F. would make extended visits and eventually be placed in the home in order to test the parenting skills of Kathleen. Soon after the beginning of this trial period, K.N.F. began to hit, bite, and curse Kathleen and her mother. Vincent found this significant because K.N.F. did not do this in her foster home. Additionally during this trial period, Kathleen failed to get recertified for food stamps claiming she did not have a stamp with which to mail the necessary paperwork. It is also noted that even though Kathleen was left with an inadequate supply of money, she nevertheless purchased a new dining room table. This type of behavior led to K.N.F.'s removal from the home.
Edmond Bergeron, a licensed psychologist, testified as an expert in the field of psychology. He evaluated Kathleen on two separate occasions in order to assess her psychological condition as it relates to her ability to parent. The first examination was conducted on October 7, 1993. Kathleen exhibited very constricted emotions and was fairly deficient in her parenting skills, relying heavily on corporal punishment. She scored an I.Q. of 67 on an intelligence test, which falls in the mild mental retardation range. According to Bergeron, this would preclude her from benefitting from instructional intervention such as parenting skills training because she does not have the mental capacity to retain what she is told.
A Rorschach Inkblot test administered to Kathleen revealed that although she has no overt psychological problems, she is likely to make poor judgments, has poor interpersonal skills, has problems dealing with stress, and suffers from a schizoid personality.
The second examination was conducted on July 7, 1995. This examination consisted of an intelligence test, a MCMI-III, and a Child Abuse Potential Inventory. On the intelligence test, Kathleen scored a 70 I.Q. According to Bergeron, a three point increase is quite common on the second intelligence test.
The MCMI-III revealed that Kathleen's psychosis is severe and chronic. Although there are times in which she will function within normal limits, she typically experiences periods of marked emotional, cognitive, and behavioral problems.
The Child Abuse Potential Inventory indicated that Kathleen is at a high risk to engage in abusive behavior. She typically feels overwhelmed indicating the possibility of physical abuse.
The results of these tests led Bergeron to make the diagnosis that Kathleen has a depressive disorder with agitated features and a personality disorder with schizoid and paranoid features with little promise for an improvement in her condition. Bergeron opined that K.N.F. would be at risk from a standpoint of neglect because Kathleen has the propensity to neglect a lot of obligations, which would include any parental responsibilities, when under a normal level of stress.
In light of this evidence, we find that the trial court's determination that the state proved by clear and convincing evidence that Kathleen is unfit to retain parental control is correct.

*170 REFORMATION
In State in Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309, 1317 (La.1993), after a thorough review of the jurisprudence relative to the issue of a parent's indication of reformation, the court found that:
The jurisprudence indicates to us that there is no expectation of reformation and no likelihood of reformation when the parent exhibits prolonged and consistent abusive or negligent behavior or a long history of substance abuse. Furthermore, conduct such as mental or behavioral disorders which cause a parent to refuse to cooperate with the authorities in addressing the needs of the child would also suggest that no reasonable expectation of reformation exists and that it is unlikely that the parent will reform.
In the case sub judice, the trial court found that there was little chance that Kathleen would reform in the foreseeable future. We agree. When K.N.F. was returned to the Kathleen's home for the trial period, Kathleen failed to demonstrate that she was capable of providing for her. This point is illustrated by the fact that her loss of eligibility for food stamps resulted because she was unable to obtain a postage stamp. It is this inability to exhibit the responsibility to perform even the simplest of tasks that raises grave doubts concerning her ability to parent. Indeed, Dr. Bergeron testified that this is consistent with her psychological profile and that her situation is unlikely to improve because, although her psychosis can go into remission, it is chronic; she will likely suffer from this throughout her lifetime because her mild mental retardation will also cause her psychological problems to be prolonged. Bergeron stated that people with low intellectual functioning have great difficulty recovering from such disorders and these disorders tend to be permanent.
We find that the trial court was reasonable in holding that Kathleen has shown no significant, substantial indication of reformation, nor is there a reasonable expectation of reformation in the near future.

DECREE
For the foregoing reasons, we find that the trial court was correct in finding that the state successfully proved, by clear and convincing evidence, all required elements of La.Ch.Code art. 1015(4). Accordingly, we affirm.
AFFIRMED.